UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| KEN ROMERO | CIVIL ACTION NO. 6:06cv0263 |
| VERSUS | JUDGE TUCKER L. MELANÇON |
| CAJUN STABILIZING BOATS INC., ET AL. | MAGISTRATE JUDGE METHVIN |

## MEMORANDUM RULING

Before the Court is defendant's Motion for Summary Judgment [Rec. Doc. 48]; plaintiff's Response [Rec. Doc. 53] and Supplemental Response [Rec. Doc. 61] in opposition thereto; and defendant's Reply [Rec. Doc.62]. For the reasons stated, defendant's Motion [Rec. Doc. 48] will be **GRANTED**.

### I.  FACTUAL BACKGROUND

Plaintiff, Ken Romero ("plaintiff" or "Romero"), was injured when he allegedly fell down a man-hole on or about June 6, 2005 as he descended into the rudder room of a jack-up service vessel, the M/V MR. COURT, owned by defendant, Cajun Stabilizing Boats, Inc. ("defendant"). (*Plaintiff's Opposition,* p. 1).  At the time of the incident, plaintiff was employed by and working in the course and scope of his employment with Marine Industrial Fabricators ("MIF").  (*Defendant's Motion,* p. 3; Ex. 1:*Deposition of Ken Romero,* pp 6-8*).*  Romero had been employed by MIF as a fitter/welder for

a number of years, during the course of which he had frequently worked about lift-boats such as the MR. COURT, and had worked on the MR. COURT while it was dry-docked for a U.S. Coast Guard Inspection and general maintenance work in the Port of Iberia, Louisiana for several weeks prior to the incident. *Id.;* Ex. 1 at pp 6-8, 27.

On the day of the incident, Romero was working in the starboard rudder compartment, an area of the vessel he had worked in for several days prior. *Id*. This area is accessed by a man-hole cover located on the deck of the vessel. *Id.* As Romero began to climb down the angle iron supports located inside the rudder room, he slipped, causing him to twist his knee. *Id.* Defendant alleges, and plaintiff does not dispute, that Romero had accessed this rudder room using the same manhole several times in the days prior to this incident and was aware that the interior of this rudder room had been coated with a slippery anti-corrosive material:

> Romero admits that, prior to his fall, his usual and customary method of descending into the rudder room included holding on to permanent, welded, iron safety rails as he would place one foot after the other, one step at a time, onto angle iron steps that themselves were welded onto the hull of the boat, fashioning an access ladder. *Id at pages 48-50.* He had used this method numerous times before to gain access to the rudder room aboard this and many other similar vessels. Despite his prior, more prudent prior practices, Mr. Romero alleges that his accident occurred when he slipped on one of the middle rungs or steps and that he could not break his fall because a temporary safety

barricade which he then grabbed to brace himself slid and did not stop his fall *Id at pages 74-75* . . . .

Mr. Romero had worked only on this vessel during the week preceding his fall and he had gone down the hole using the angle-irons at least 1-2 times on the day of the fall in near identical conditions and used even used a similar manhole to gain entry to the engine room which connected to the starboard rudder room. *Id at page 46.* Mr. Romero had gone down these same hatches several times in the weeks preceding the accident where the conditions were virtually identical. *Id at pages 46-49.*

On the occasion of his alleged fall and injuries, Romero took a completely different approach from the safe, usual and customary method of holding onto iron safety railings: Romero sat on the side of the manhole with his feet dangling and he alone made the decision to enter the manhole by starting down with one foot per rung (iron step) rather than by bringing both feet to each rung before moving to the next. For the very first time in his experience with this and other similar boats, he opted to grab hold of a portable steel safety barricade which had been placed temporarily around the hole to prevent accidental top-side falls in the hole, but he does not know why he chose to subsequently grab for the barricade rather than the using the permanent railings as support. *See, Exhibit 1 at pages 48-51.* He admits that he was satisfied that the barricade was sturdy enough and it would be able to brace him despite it not being permanently fixed to the vessel and despite, at less than 100 pounds, weighing significantly less than he did. *Id.*

Mr. Romero began his descent and had taken the first two to three steps when he felt his body shift and his foot slip off of one of the steps; he was only using one foot per step and thus could not balance himself with the other foot. *Id. at page 63.* He had negotiated the first two or three of the five to six steps and his chest was about level with the deck floor when he began to slip and then tried to grab hold of and secure himself with the portable (non-fixed) safety barricade and fell. *Id. at pages 62-62, 66-68.* The temporary barricade he chose to hold onto slid and moved

>along the deck whereupon he lost his grip and fell to the floor of the rudder room, a distance about equal to the last few steps.

*Id.* at pp. 3-5*;* citations are to Exhibit: 1*,*Deposition of Ken Romero.

Plaintiff does not dispute or otherwise address this statement of fact, but alleges "Romero would not have fallen if the vessel had been properly cleaned to remove the grease and/or an iron barricade on the vessel that Romero was using for support had not given way. The barricade would have remained in place if Defendants had welded the barricade to the vessel's deck (as is the normal industry practice)." (*Plaintiff's Opposition*, p. 2; Ex. A, Deposition of Ken Romero, pp. 16:1-2; p. 33:12-22).

On February 16, 2007, Romero commenced this litigation, alleging that he sustained severe and painful injuries to his knee, back, and other parts of his body as a result of the conditions on the vessel, which was caused by defendant's negligence and the vessel's unseaworthiness: "plaintiff's injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, its crews and appurtenances and/or equipment or, in whole or in part, as a proximate result of the initial acts and/or negligence or lack of attention on the part of Defendants, their agents, servants and/or employees acting in the course and scope of their employment and agency." (*Complaint* [Rec. Doc. 1], pg. 3).

Defendant moves for summary judgment alleging that Romero was a maritime employee and that his alleged injuries were not caused by negligence of the vessel, the M/V MR. COURT. As such, defendant avers that it is not liable to the plaintiff for his injuries under the Longshore & Harbor Workers' Compensation Act, 33 USCA § 905(b), and that, as a matter of law, plaintiff's suit should be dismissed. (*Defendant's Motion,* p.1).

Plaintiff responds that the Court should deny defendant's Motion, because there are genuine issues of material fact exist regarding: (1) defendant's breach of its turnover duty to plaintiff; (2) defendant's active control over the vessel in issue; and (3) defendant's knowledge of two serious hazards aboard the vessel. (*Plaintiff's Opposition*, p. 1). Plaintiff, in its Supplemental Response, submits the report of Edward Ziegler, a purported registered Professional Engineer and Certified Safety Professional, which allegedly "prominently sets forth numerous facts and expert opinions bearing on Defendant's liability for the underlying incident in this case." (*Plaintiff's Supplemental Response,* pg. 1).

Defendant replies to plaintiff's Supplemental Response and the submitted expert report, that Ziegler's "observations do not apply to the service vessel M/V MR. COURT," because Ziegler's report considers and purportedly applies the Occupational Safety and Health Administration's

("OSHA") regulations. Defendant alleges that OSHA regulations are pre-empted with respect to "inspected vessels" because the Coast Guard exercises broad statutory authority over maritime workers' occupational health and safety, through 46 U.S.C. § 3306. (*Defendant's Reply*, p1).

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that

there is a genuine issue for trial.[1] *Id.* at 322-23. Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.,* 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144. 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson,* 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[1] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56© *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

## II. LEGAL ANALYSIS

### A. VESSEL LIABILITY

Under the Longshore and Harbor Workers' Compensation Act (the "LHWCA"), 33 U.S.C. § 901, *et seq*, if a maritime employee is injured during the course and scope of his employment due to the negligence of a vessel, he may bring an action against the vessel owner to recover damages. 33 U.S.C. § 905(b). However, the Fifth Circuit has stated that, "[a]n injured longshoreman must navigate the channels of the LHWCA before he can drop anchor in the vessel owner's pocketbook and claim his booty." *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 880 (5th Cir. 1983), *rehearing denied* 724 F.2d 976 (5th Cir. 1984), *citing Lemon v. Bank Lines, Ltd.,* 656 F.2d 110, 113 (5th Cir.1981). To guide in this navigation, the United States Supreme Court has provided a treasure map of sorts, outlining the three duties owed by the vessel owner to workers. These duties are: (1) the

"Turnover Duty," (2) the "Active Control Duty," and (3) the "Duty to Intervene." *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981); *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92 (1994). In this case, defendant claims that all of these duties have been fulfilled, and, accordingly, it is not liable for the plaintiff's injuries and should be granted summary judgment. Conversely, the plaintiff claims that material issues of fact remain as to the vessel's fulfilment of each of these duties and, thus, summary judgment should be denied. Each of these duties will be addressed in turn.

### 1. TURNOVER DUTY

In *Howlett v. Birkdale Shipping Co., S.A.*, the United States Supreme Court stated that the "Turnover Duty" requires a vessel owner to

> ... "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." *Howlett*, 512 U.S. at 98, *citing Scindia Steam Navigation Co.*, 451 U.S. at 167.

This duty also requires the owner to

> ... warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would

not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Id.*

Courts have noted that the turnover duty is a **narrow one** because "[s]ubjecting vessels to suit for injuries that could be anticipated and prevented by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 amendments [to the LHWCA]." *Id* at 97.

Here, plaintiff claims that defendant violated this duty by failing to warn of the slippery anti-corrosive substance contained in the rudder room. Defendant, on the other hand, states that the substance contained in the engine room was not a hidden defect and, at the time of turnover, there was no defect in the vessel. The presence of the anti-corrosive substance in the rudder room of a vessel is not uncommon. Because it is so common, the vessel owner could reasonably expect that plaintiff, as an experienced maritime worker, or, at the very least, his employer, MIF, was aware, at the time of turnover, of any potential danger that this substance may have presented. In fact, as a testament to his experience and knowledge, for several days prior to the accident, plaintiff, as well as his co-workers, safely maneuvered around the ship, including within the area where the accident occurred, without incident. *(Deposition of Ken Romero,* pp 48-49). The

accident only occurred after the plaintiff, for the first time since he began working on the vessel, chose to improperly, and unsafely, descend through the manhole.  *Id,* pp 48-50.

Even if the presence of the substance was not common, however, any hazard posed was open and obvious and not unknown to plaintiff.[2]  Plaintiff admitted as much when he stated he knew the substance was present on the rungs and the deck before he descended into the rudder room. *Id at pg 73*. Further bolstering defendant's position is the fact that plaintiff also admitted that he and his fellow workers were responsible for the anti-corrosive substance being present on the deck of the ship and the rungs of the ladder where plaintiff fell. *Id,* pp 51-52.  The presence of the substance on the rungs and the improper method of descent is what ultimately caused the plaintiff's fall and subsequent injuries.  Any hazard posed was obvious to the plaintiff and was in no way concealed.  Defendant cannot be held liable for the plaintiff's failure to take caution in the face of such hazard.

In sum, because it is reasonable to expect that an experience maritime employee would be aware of the danger posed by the common presence of slippery anti-corrosive material on a vessel, and because any hazard posed

---

[2] *See Irvin v. U.S. Military Sealift Command*, 88 Fed.Appx. 10 (5th Cir. 2004) (Holding that plaintiff failed to establish that grease on a hatch cover was not an open and obvious hazard and affirming summary judgment in favor of the defendant.)

11

would be open and obvious to workers aboard the vessel, defendant did not violate its turnover duty.  This Court agrees with the plaintiff that the case of *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879 (5th Cir. 1983), is on point.  There, the Fifth Circuit found that the vessel owner had no duty to warn the contractor or the maritime employee of the presence of slippery soybean residue because such residue was common and should have been anticipated by the shipyard.  *Stass*, 720 F.2d at 884.  The same is true in this case and the same result is appropriate.

### 2. ACTIVE CONTROL DUTY

The second duty owed by the vessel owner is the "Active Control" duty.  This duty requires the vessel owner to exercise reasonable care to make the vessel safe if (1) it actively participates in the operations, or (2) it maintains control over the area, or (3) such a duty is imposed upon the vessel owner by contract, positive law, or custom.  *Howlett*, 512 U.S. at 98, *citing Scindia Steam Navigation Co.*, 451 U.S. at 167.  If active control is not maintained, once the work starts, the shipowner has no general duty to monitor the operations and "... may rely on the stevedore's judgment that equipment is reasonably safe for continued use and work."  *Stass,* 720 F.2d at 882.  In order for the shipowner to be liable under this duty, the vessel must exercise active control over the actual methods and operative details of the maritime

employee's work - mere presence of the vessel's agents will not constitute active control. *Pledger v. Phil Guilbeau Offshore, Inc.,* 88 Fed.Appx. 690, 692 (5th Cir. 2004).

Plaintiff in this case admits that at the time of his accident, neither the owner of the vessel nor its agents were even present on the vessel. (*Deposition of Ken Romero,* pg. 60). In fact, plaintiff was solely responsible for the decision to continue work after a rain shower on the day of the accident. *Id*. Furthermore, the metal barricade, which plaintiff claims contributed to his fall, was erected and maintained solely by MIF – not the defendant. *Id* at 33-34. Plaintiff avers that the occasional presence of Tommy Hebert, the defendant's agent, was sufficient to give rise to the active control duty. However, the record reflects no evidence showing that defendant actually maintained control over the operative details of the maritime employee's work. To the contrary, plaintiff's own admissions show that he and his employer exercised operative control over the work to be completed. *Id.* As such, defendant did not maintain active control of the vessel and cannot be held liable under the active control doctrine.

### 3. DUTY TO INTERVENE

As already mentioned, the shipowner is entitled to rely on the maritime employer's expertise and judgment. However, the shipowner may only so rely

13

until he becomes aware of a hazard that the that the employer is unreasonably failing to protect the workers against. *Howlett*, 512 U.S. at 98, *citing Scindia Steam Navigation Co.*, 451 U.S. at 167. When the employer becomes aware of such a hazard, he has a duty to intervene and remedy the hazard. *Id.* Like the turnover duty, however, this duty is a **narrow one**. *Futo v. Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209 (5th Cir. 1984).

To establish the duty to intervene, a plaintiff must first show that the vessel owner was actually aware of the dangerous condition. *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir. 1983). Constructive knowledge does not subject the owner to this duty. *Id*. However, the Fifth Circuit has repeatedly held that the duty to intervene requires that a plaintiff show "something more" than the vessel owner's mere knowledge of a dangerous condition. *Futo*, 742 F.2d at 215; *see also Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997), *rehearing denied* 117 F.3d 1419 (5th Cir. 1997), *cert denied* 522 U.S. 995 (1997); *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 29 (5th Cir. 1996). The Fifth Circuit has characterized that "something more" as requiring a plaintiff to show not only that the shipowner had actual knowledge of the defect and of the maritime employer's continuing use of the defective item or practice, but also that "(1) [the shipowner] has actual knowledge that the [defect] posed an unreasonable risk of harm and

(2) actual knowledge that it could not rely on the [maritime employer] to protect its employees and that if unremedied the condition posed a substantial risk of injury." *Greenwood,* 111 F.3d at 1249.

Because the vessel owner is generally permitted to rely on the contractor's expert judgment as to the safety of its working conditions, to trigger the duty to intervene, a dangerous condition must be "so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm." *Id* at 1249. The Fifth Circuit has also ruled that the duty to intervene "does not ... extend to an open and obvious transitory condition ... that is created entirely by the independent contractor, is under its control, and relates wholly to its gear and operations." *Futo*, 742 F.2d at 216.

In this case, plaintiff claims that defendant knew of the hazard created by the movable barricade and the anti-corrosive substance yet failed to intervene. However, in his deposition, plaintiff admitted that he did not tell the shipowner of the dangers until after the accident had already happened. (*Deposition of Ken Romero,* pp. 42-43). The record is devoid of any evidence that defendant had actual knowledge of the alleged hazards before the accident occurred.

Assuming, *arguendo*, that defendant did have actual knowledge of the hazards, any hazard created by the movable barricade was entirely the doing

15

of the independent contractor and related entirely to the gear and operations of the contractor. Nothing in the record suggests that defendant had any reason to suspect that the unwelded barricade posed an unreasonable risk of harm to the workers. The shipowner, then, was reasonable to rely on the expertise of MIF in this matter and had no duty to intervene.

Similarly, any hazard created by the anti-corrosive material, as discussed previously, was open and obvious and defendant had no duty to warn of such a condition. For weeks prior to the accident, the maritime employees worked safely and without incident. The exacerbation of the alleged hazard by the plaintiff and his co-workers by spreading the substance to the deck and the rungs of the access ladder was wholly the fault of the independent contractor and the defendant should not be charged with the duty to intervene when he was reasonable in relying on the safety expertise of the contractor concerning this condition.

Finally, neither the barricade nor the presence of the anti-corrosive substance presented a condition "so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm." Plaintiff, and his co-workers, managed to complete their jobs safely and without incident for several days prior to the accident. The primary cause of the accident was not the presence of the anti-corrosive material in the rudder room or the fact that

the barricade was not welded down, but the haphazard manner in which the plaintiff, knowing that the steps were slippery, decided to descend into the rudder room on that particular occasion. No fault can be attributed to the defendant for the plaintiff's failure to utilize the known, available, and safe method of descending into the rudder room - using the permanently attached safety rails and descending the ladder one rung at a time. Accordingly, defendant had no duty to intervene in this case.

### B. OSHA APPLICABILITY

In his supplemental response to defendant's Motion for Summary Judgment, plaintiff submits the report of Edward Ziegler and claims that the report "prominently sets forth numerous facts and expert opinions bearing on Defendant's liability for the underlying incident in this case." (*Plaintiff's Supplemental Response,* pg. 1). In this report, Ziegler purports to apply OSHA standards to the facts surrounding this case. *Id*. In its reply, defendant avers that such standards are inapplicable because the U.S. Coast Guard Regulations preempt the OSHA regulations as they relate to inspected vessels.

In *Chao v. Mallard Bay Drilling, Inc*., 534 U.S. 235 (2002), the United States Supreme Court stated that "... OSHA's regulations have been pre-empted with respect to *inspected* vessels because the Coast guard has broad

statutory authority to regulate the occupational health and safety of seamen aboard inspected vessels, [. . .], and it has exercised that authority." *Chao*, 534 U.S. at 243. This holding is supported by a Memorandum of Understanding jointly issued by OSHA and the Coast Guard in 1983. Specifically, this Memorandum states that "OSHA has concluded that it may not enforce the OSH Act with respect to working conditions of seamen aboard inspected vessels." There can be no serious contention by either side that this case does not involve an "inspected vessel" and a "seaman" as used in this Memorandum. Similarly, Title 29, Section 1915.2 of the Code of Federal Regulations states that the regulations cited in Ziegler's report "[do] not apply to maters under the control of the United States Coast Guard [. . .] including, but not restricted to, the [. . .] design, construction and maintenance of the vessel, its gear and equipment." 29 C.F.R. §1915.2. As such, the application of the OSHA regulations cited in the report is not appropriate and, thus, Ziegler's report, at least as it applies to the defendant, does not create any material issue of fact sufficient to survive summary judgment.

Even if OSHA Regulations were applicable to the facts of this case, defendant would not be responsible for compliance. Title 29, Section 1915.3 of the Code of Federal Regulations addresses which parties are responsible for compliance with the "Occupational Safety and Health Standards for

Shipyard Employment." 29 C.F.R. §1915.3. Under these regulations, it is the **employers** who are charged with compliance - not the shipowners. *Id.* In fact, the first sentence of Subsection (b) of Section 1915.3 states, that "[t]his part does not apply to owners, operators, agents, or masters of vessels unless such persons acting as 'employers.'" *Id*. It is undisputed that plaintiff was not employed by defendant, rather plaintiff was employed by MIF and, as such, MIF, and not the defendants, would be charged with the responsibility of compliance.

### III. CONCLUSION

Based on the record before the court, for the foregoing reasons, the Court finds that, as a matter of law, the defendant, Cajun Stabilizing Boats, Inc., fulfilled its duties as vessel owner to the plaintiff, Ken Romero. Plaintiff has presented no evidence sufficient to raise a material issue of fact, and, accordingly, defendant's Motion for Summary Judgment [Rec. Doc. 48] will be **GRANTED**.